[Cite as *State v. Smith*, 2013-Ohio-2627.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 12CA9 |
| | : | |
| vs. | : | |
| | : | DECISION AND JUDGMENT |
| GERALD A. SMITH, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | **Released: 06/07/13** |

_____
APPEARANCES:

George J. Cosenza, Parkersburg, West Virginia, for Appellant.

James E. Schneider, Washington County Prosecutor, and Kevin A. Rings, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for Appellee.
_____

McFarland, P.J.

{¶1} Gerald A. Smith appeals his conviction in the Washington County Court of Common Pleas after a jury found him guilty of one count of aggravated murder, two counts of aggravated burglary, two counts of aggravated robbery, grand theft of a firearm, grand theft of a motor vehicle, grand theft from an elderly person, and tampering with evidence. On appeal, Smith contends that (1) he was denied effective assistance of counsel, and (2) the trial court erred by denying his Rule 29 motion to dismiss the charge of tampering with evidence. Upon review, we find Appellant was not

denied effective assistance of counsel.  We further find the trial transcript contains evidence from which any rational trier of fact could have found the essential elements of tampering with evidence proven beyond a reasonable doubt. As such the trial court did not err in failing to grant the Crim.R.29 motion to dismiss.  Accordingly, we overrule both assignments of error and affirm the judgment of the trial court.

## FACTS

{¶2}  Homer Rogers, age 66, was murdered in his home on Burnett Road in Cutler, Ohio, apparently while he slept.  On the morning of June 19, 2010, he was found on a living room couch, covered by a blanket, with a knife wound to the right side of his neck.  At the time of his death, Rogers' daughter Cynthia Lynn Rogers (hereinafter "Lynn") and her children also resided in the home on Burnett Road.   Lynn had been separated from her husband, Gerald Smith, Appellant herein, for several weeks. Appellant was living in the marital home on Kenny Road, approximately 2-3 miles from the Rogers' home.  Appellant and his wife had been married approximately 20 years and had a violent history.

{¶3}  Soon after decedent's body was discovered, Appellant became the prime suspect in the murder investigation.   That same day, decedent's red pickup truck was found in Athens County at the home of Allen Shane

Lucas, Appellant's cousin and close friend. A knife with a reddish- brown substance which appeared to be blood on the blade was found in the center console of the red truck. Also on June 19th, Athens County 911 received a phone call from Shane Lucas saying Appellant was with him at Strouds Run State Park in Athens County, and Appellant had confessed to killing Homer Rogers. Later, on June 19th, Appellant was tased and apprehended at Stroud's Run State Park.

{¶4} Appellant was indicted in July 2010 for the aggravated murder of Homer Rogers; two counts of aggravated burglary; two counts of aggravated robbery; grand theft of a firearm; grand theft of a motor vehicle; grand theft from an elderly person, and tampering with evidence. Appellant entered pleas of not guilty by reason of insanity. In September 2010, Appellant was found not competent to stand trial, not capable of understanding the nature and severity of charges against him, and not capable of assisting his attorney due to his severe mental illness. In March 2011, Appellant was found competent to stand trial. In a status report regarding competency restoration pursuant to R.C. 2945.38(F), Dr. Dennish M. Eshbaugh, PhD, noted hospital records revealed Appellant had been considered to be malingering symptoms of mental illness and memory deficits. Appellant proceeded to trial on November 28, 2011.

{¶5} At trial, the State's first witness was Lynn Rogers. She testified on June 18, 2010, her son Cody Smith informed her Appellant was calling her father's house repeatedly. Cody said "Pap" [Homer Rogers] was getting upset and was going to call the law and have Appellant arrested if the calls didn't stop. Ms. Rogers testified she then called Appellant, sometime between 11:30 and 12:00 p.m., and told him to stop calling. During the course of that conversation, Lynn said to Appellant: "I'm not coming home. I'm done. I did it for 20 years. Our kids are grown and they can take care of themselves." Appellant then asked her where she was and who she was with. Lynn testified she responded to the effect it was "none of his fucking business where I was at and it wasn't none of his business who I was with." She then hung up the phone. Lynn stayed with a friend, Wayne McClain, that evening and did not return to her father's house until 7:30 a.m. on June 19th. Her father's red pickup truck was not there.

{¶6} Lynn Rogers also testified when she returned home, she took a shower and proceeded to prepare a Father's Day dinner for her father. Her father appeared to be asleep on the living room couch. Cody Smith was sleeping on a loveseat in the same room. Jessica Trus, Lynn's granddaughter, was sleeping on the floor in front of the television. Lynn also noticed her dog Bubba was in the house. She was surprised to see the

dog because she had not seen him since she left her husband in April. Lynn and Jessica proceeded to take the dog back to Appellant's trailer, but dropped him off some distance from the trailer so Appellant would not see her. When she passed the trailer, she noticed her father's car trailer sitting in the driveway.

{¶7} Lynn and Jessica returned home. Lynn began working in the kitchen when her daughter Tana Rogers told her to "go check on Pap." When Lynn spoke to him and touched his foot, her father did not move and he was not breathing. Lynn testified she pulled his blanket down and blood was everywhere. She called 911 around 9:30 a.m.

{¶8} At trial, Lynn also described her "rocky" marriage to Appellant. She testified she stayed with him for the sake of the children and "so he wouldn't kill my dad." She testified he consumed alcohol heavily over the years. Lynn further testified to damaging statements allegedly made by Appellant. These statements describing threats and abuse were not provided in discovery nor objected to at trial. Essentially, Rogers testified during the course of their approximately 20 years of marriage, Appellant on various occasions shot at her; kicked, punched, bit, and slapped her; knocked her to the ground; and pulled her by her hair. She testified the abuse began in 1989. She further testified she left Appellant approximately 15 times over

the years, but always returned because he threatened her or her family. She testified he said "Somebody in your family's going to fucking die." During her testimony, Lynn Rogers identified State's Exhibit B, a single knife; State's Exhibit C, a 22 revolver her father kept on the living room wall; and State's Exhibit D, two additional knives. Lynn Rogers testified Appellant and she bought the three knives in Athens County three months prior.

{¶9} Kimberly Schaefer, Homer Rogers' other daughter, also testified at trial. Ms. Schaefer and her family lived next door to the decedent. She testified at the time of his death, her father owned a red 2005 GMC Sierra pickup truck. The truck was also equipped with a topper, brush guard, and a trailer hitch. A car trailer was attached to the truck. Her father had been at her house on the night of June 18, 2010, until approximately 11:30 p.m. When he left and walked home, his truck and trailer were in his yard. When she awoke around 7:15 a.m. the next morning, she noticed her father's red pickup truck was gone. During her testimony, Ms. Schaefer also identified her father's 22 revolver.

{¶10} The State also presented testimony from Robert Shott, a forensic pathologist with the Montgomery County Coroner's Office. Dr. Shott performed the autopsy of Homer Roger's body and determined that the cause of death was a single sharp-force injury to the neck. He described a

stab wound on the right side of the decedent's neck, approximately one-half inch. He testified the wound severed the spinal cord at the C-1 and C2 levels, which in effect, lead to instant and complete paralysis of the body below the neck. In Dr. Shott's opinion, the stab wound was likely caused by a single-edged knife, with only one sharpened side. Dr. Shott opined that State's Exhibit B, a box containing a single-edged knife, was consistent with the type of weapon that could have caused the wound on Homer Rogers. Dr. Shott also opined that for the injury to get through the decedent's skin, muscle, and bones, it would have taken a significant amount of force. Dr. Shott testified that there was no evidence of injuries on the decedent's hands or forearms, or any defensive- type wounds which would indicate a struggle or fight with another person.

{¶11} The next State's witness was Bryan White with the Ohio Bureau of Criminal Investigation (BCI). He investigated decedent's red truck at the Sheriff's Office. A wooden-handled knife with a five-inch blade was found in the center console of the truck. It had a reddish- brown substance that was later positively identified to be blood. The knife was photographed, packaged, and submitted to BCI for further examination. Mr. White identified the knife as State's Exhibit B.

{¶12} Tim Jenkins also testified on behalf of the State. Mr. Jenkins is a distant relative of Appellant. He testified to seeing Appellant at a party in Chesterhill, Ohio (Morgan County) around 12:30 or 1:00 a.m. on June 19th. Mr. Jenkins saw Appellant drive up in a Ford diesel truck with a brush guard. Mr. Jenkins testified Appellant appeared to have been drinking. He was able to walk across a flat area 50-75 feet to get to Jenkins. He testified Appellant did not appear so impaired that he could not drive.

{¶13} Scott Parks, a detective with the Washington County Sheriff's Office also testified he was at the Rogers' home to assist with the investigation. He was assigned to stand by the crime scene and coordinate with BCI agents. He arrived at approximately 11:25 a.m. Detective Parks testified although there was a bit of blood spatter on the wall, there were no signs of struggle in the house.

{¶14} The State presented testimony from Emily Draper, a forensic scientist with Ohio BCI. She performed DNA testing on samples obtained from Gerald Smith and Homer Rogers. Ms. Draper testified she gave her computer printout as to the DNA samples tested to Raymond Peoples, another forensic scientist with Ohio BCI.

{¶15} Raymond Peoples next testified when the evidence samples first arrived at BCI, Peter Tassi, Jr., a forensic biologist, examined them and

prepared a report. [1] Mr. Peoples obtained the Tassi report and the computer printout from Ms. Draper for review. At that point, Mr. Peoples performed DNA testing on two samples, one from the blade of the knife and one from the handle of the knife. He testified the DNA profile from the blade of the knife was a mixture. The major profile in the mixture was consistent with Homer Rogers' DNA; the minor profile was consistent with Gerald Smith's DNA. The DNA profile from the handle of the knife was consistent with Gerald Smith's DNA sample.

{¶16} The jury also heard testimony from Allen "Shane" Lucas, Appellant's first cousin. Shane Lucas testified he was aware that Appellant had marital problems. As a result, Appellant had stayed overnight at the Lucas home in Athens County in the past.

{¶17} Shane Lucas further testified on June 19, 2010, Appellant showed up at the Lucas home around 4:30 -5:00 a.m. Appellant wanted to get beer. He indicated a friend had dropped him off. Shane Lucas could see Appellant had already been consuming and he described Appellant as "pretty tanked." Shane Lucas recalled Appellant had recently been in a motorcycle accident and had injured his ribs and one leg. Appellant was walking with a limp.

---

[1] Peter Tassi, Jr. was subpoenaed for trial. On the day he was to testify, he was excused because of personal illness. Counsel stipulated to admission of his report.

{¶18}  Around 5:30 a.m., Shane Lucas and Appellant bought three 6-packs of beer and drank it at the Lucas house. The Lucas family had planned to go boating that day at Stroud's Run State Park.  When the Lucases left to go boating before noon, Appellant went with them. While out on water, Shane Lucas's cousin, Bo Lucas of Chillicothe, called.  Cheryl Lucas, Shane's wife, answered the phone.  Bo Lucas informed her "Gerald killed Homer."  Cheryl then handed Shane the phone and Bo Lucas gave him the same information.  Cheryl Lucas hung up the phone. During this time, Appellant had been passed out on the front of the boat.  Cheryl Lucas woke up Appellant and asked him "Gerald, did you kill Homer?"

{¶19}  Then, according to Shane Lucas's testimony, Appellant confessed to stabbing Homer Rogers.  Appellant told them that Lynn had called Appellant and wanted him to come to her father's house.  He went to the home, where Homer Rogers was waiting for him with a gun. Appellant told the Lucases they fought over the gun.  Appellant admitted either hitting or stabbing Mr. Rogers with something.  He then told the Lucases he "picked him up, put him on the couch, and covered him up."   Shane Lucas testified Appellant was crying when he confessed.

{¶20}  At this point, Shane Lucas took his boat to shore.  Shane Lucas and Appellant got off the boat.  Shane Lucas took Appellant to the

Stroud's Run campground.  At this point he noticed Appellant had a revolver.  Mr. Lucas then called Athens 911 and advised the dispatcher that Appellant killed Homer Rogers. Shane Lucas specifically told police Appellant admitted stabbing or hitting Rogers in the neck.

{¶21}  Shane Lucas also testified he later learned Appellant had driven decedent's red pickup truck and parked it on his property. Appellant's driveway is 60 yards or longer, from Salem Road.  His house is located at the top of the driveway.   Beyond the Lucas house is a field.  Decedent's truck was parked over a trash pile, about 30 feet from the house. Shane Lucas testified Appellant had driven the decedent's truck before but would park in the general area of the house, not up into the woods.

{¶22}  The next State's witness was Detective Mark Johnson from the Washington County Sheriff's Office. Detective Johnson testified that when he walked through the Rogers' house, he saw no signs of struggle.  There were no signs of gunshot holes or a gun being fired. Detective Johnson identified State's Exhibit H-1, a photograph of the decedent's 22 revolver with six rounds. He testified this was the gun Appellant had in his possession before he was taken into custody.

{¶23}  Detective Johnson further testified Chief Deputy Mark Warden (hereinafter "Warden") and he drove to the Lucas residence. The Lucas

residence is nearly 100 yards off Salem Road.  When they arrived, they found the decedent's red truck driven up over a trash pile and down into a brushy wooded area.  Detective Johnson testified the truck was parked 30-40 yards from Shane Lucas's residence and he did not think it could be seen from Salem Road.  Detective Johnson did not see the truck until it was pointed out to him.   Detective Johnson drove the truck off the trash pile and down to a flat spot so a tow truck driver could transport it to the Washington County Sheriff's Office.  He identified State's Exhibits H-2 and H-3, photographs of the truck and where it was found.  These photographs demonstrate the pickup truck was partially hidden from view.

{¶24}  While inside the truck, Detective Johnson saw the knife that was found in the center console. Detective Johnson testified he later obtained pictures of the knife from BCI.  He showed the photographs to Lynn Rogers.  She identified the knife in the photographs as being the knife Appellant and she had previously purchased.  A week or so later, Lynn took Detective Johnson to Appellant's trailer and showed him the other two knives.

{¶25}  The State's final witness was Chief Deputy Mark Warden. Warden testified when he responded to the Rogers' residence, he took control of the crime scene.  He met with the first responding officer and

obtained the initial information.  Warden called out other officers for assistance and walked through the house.  Warden also learned that Cody Smith's whereabouts were unaccounted for and the family present at the scene suspected Appellant.   Warden sent two deputies to Appellant's residence, looking for Cody.  The deputies advised that decedent's car trailer was at Appellant's residence.   Those deputies were then advised to secure Appellant's residence as a crime scene.   Eventually, Warden and Detective Johnson proceeded to the Lucas residence.   While en route, the two received a phone call from Athens County 911 informing they had received a phone call from Shane Lucas.  Shane Lucas had advised 911 that Appellant was with him at Stroud's Run State Park, and Appellant had confessed to killing Homer Rogers.

{¶26}  Warden testified when they arrived at Stroud's Run, they were informed Appellant had a handgun.  They were further advised Appellant had told Shane Lucas he was going to "go out by police," i.e. "suicide by cop."   The two first interviewed Shane Lucas.   Mr. Lucas gave them precise information, that Appellant had fought with Homer Rogers and stabbed him.

{¶27}  At Strouds Run, Appellant was sleeping on a park bench.  A 22 revolver with six live rounds was under his head.  Before Warden and

Detective Johnson could speak to him, Appellant was tased and taken into custody by Athens law enforcement officials.  The weapon was secured. Detective Johnson Mirandized Appellant and started to interview him. Shortly into the interview, Appellant indicated he wanted to talk to Mark Warden.   Warden walked over, asked him if he understood his Miranda rights, and began questioning  him.  The entire interview with Detective Johnson and Chief Deputy Warden was recorded.  The interview is rambling, but Appellant reiterated:

> 1) he did not know where he was at, or where he had been the previous night;
>
> 2) he did not know what they were talking about when they asked him about a gun;
>
> 3) he did not remember being at [Rogers'] house;
>
> 4) he did not know what happened at [Rogers']house;
>
> 5) he did not know what happened to [Rogers];
>
> 6) he did not know how he got to Athens or Shane [Lucas's] house;
>
> 7) he "did not do it";
>
> 8) he loved his wife; and,
>
> 9) he walked in on [Rogers] raping his wife [Cynthia Lynn Rogers].[2]

---

[2] On the tape, Appellant states than two years into their marriage, he walked inside his house to find Homer Rogers raping his daughter Lynn.   Appellant stated his wife was always "messed up" in the head and that's

{¶28} Despite repeated inability to remember specific happenings, when questioned about what took place inside the Rogers' house on the night of the murder, Appellant stated that "Homer tried to kill him," and that [Homer] and his wife called him and got him to come to the house. Later in the interview, Appellant stated he was never there but hesitated, "I don't think so." Appellant also testified "I didn't go over there to do nothing." Appellant stated "I don't think I killed him. I know I didn't kill him."

{¶29} During the interview, Warden told Appellant that Shane Lucas saw him drive up. Appellant's response was: "Did he see me? The red pickup truck might be there but I didn't drive it."

{¶30} Also during the interview, Appellant stated also that his wife stood to inherit a large amount of money if her father died. He stated that over the years his wife had "begged" him to kill her father.

{¶31} Warden testified when Appellant gave the statement, he did appear to be "hung over" or had just awakened. On the recorded statement, Appellant notices having urinated on himself at some point. Appellant told Warden he had done cocaine the night before. Appellant's counsel neither filed a motion to suppress the statement nor objected to the playing of the statement at trial.

---

why he stayed with her "all those years. " Lynn Rogers denied this allegation in direct testimony and cross-examination.

{¶32} The defense presented only one witness, Lorena Smith, Appellant's daughter.[3] Ms. Smith testified she had an "o.k." childhood, and was "daddy's girl." She testified, over the years, Appellant would do drugs at Thanksgiving and Christmas.

{¶33} Ms. Smith testified Appellant was in a motorcycle crash on May 30, 2010, and broke six ribs and his leg. While in the hospital, Appellant was prescribed Percocet and Vicodin. He came to her house when he was released. He did not walk very well. Appellant was bipolar and had severe depression. Ms. Smith testified Appellant was drinking alcohol a lot when he lived with her.

{¶34} Ms. Smith further testified on June 18, 2010, Appellant was "really drunk" and arguing with her. She told him to get out of her house, and she would get him the next day when he was sober. She estimated he drank 36 beers that day. When she dropped him off at his trailer at 7:30 or 8:00 p.m., she left him with 72 more beers. Ms. Smith testified there were no vehicles at his trailer when she left him.

{¶35} Ms. Smith also opined Appellant could not have walked 2-3 miles in the country, given the intoxicated condition he was in and his physical injuries. She testified on cross-examination that if her father was at

---

[3] Lorena Smith is Jessika Trus's mother. Her husband is Adam Trus. However, at trial, Ms. Smith indicated she was separated from her husband.

the Rogers' residence, she thought somebody helped him get there. She also admitted that days before she dropped him off at his home, he was threatening to kill Homer and Lynn.   Ms. Smith testified the one thing Appellant wanted more than anything, was "his wife back," and Homer Rogers was the "one obstacle."

{¶36} Ms. Smith further testified to an incident approximately one year prior to Homer Rogers' death.  Lynn and Appellant were having dinner at Ms. Smith's house.  Ms. Smith testified Lynn told her at that time, when her father passed away, she would inherit $600,000.00.

{¶37} In closing, the defense argued in Appellant's intoxicated condition and with his physical injuries, there was no way Appellant could have walked from his trailer to the Rogers' residence.  Defense counsel also argued Lynn had a new boyfriend and was "finished" with Appellant.  She saw an opportunity to get rid of him and also inherit $600,000.00.   She knew the kind of reaction she would trigger in Appellant when she called him, refused to tell him who she was with, and hung up the phone having said, "I'm through with you."   Counsel argued that no one investigated Lynn or Wayne McClain, and Lynn steered the investigation to Appellant the entire time.

**{¶38}** Appellant was found guilty of all nine counts contained in the indictment. He was sentenced on January 27, 2012, to a total sentence of life without the option of parole and sixty additional months. [4] This timely appeal followed.

## ASSIGNMENTS OF ERROR

I. THE APPELLANT, GERALD A. SMITH, WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

II. THE COMMON PLEAS COURT FAILED TO GRANT THE DEFENDANT'S RULE 29 MOTION TO DISMISS THE CHARGE OF TAMPERING WITH EVIDENCE.

## ASSIGNMENT OF ERROR ONE

**{¶39}** Appellant contends he was denied effective assistance of counsel due to (1) counsel's failure to file a pretrial motion to suppress Appellant's statement to Chief Deputy Mark Warden, (2) counsel's failure to object to the statement's admission into evidence, and (3) counsel's failure to object to allegedly prejudicial statements attributed to defendant and testified to by his ex-wife.

## A. STANDARD OF REVIEW

**{¶40}** Criminal defendants have a right to counsel, including a

---

[4] Appellant was not sentenced on counts two, three, four, and seven of the indictment as they were considered to be allied offenses of similar import to count one, aggravated murder. As to count six, he was sentenced to thirty months to be served consecutively. As to count eight, he was sentenced to thirty months to be served consecutively. As to count nine, he was sentenced to thirty months to be served concurrently.

right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S.

759, 790, 90 S. Ct. 1441; *State v. Stout,* 4th Dist. No. 07CA5, 2008-Ohio-

1366, 2008 WL 757521, ¶ 21. To establish constitutionally ineffective

assistance of counsel, a defendant must show (1) that his counsel's

performance was deficient and (2) that the deficient performance deprived

him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct.

2052; *State v. Issa,* 93 Ohio St. 3d 49, 67, 752 N.E. 2d 904 (2001); *State v.

Goff,* 82 Ohio St. 3d 123, 139, 694 N.E. 2d 916 (1998). "In order to show

deficient performance, the defendant must prove that counsel's performance

fell below an objective level of reasonable representation. To show

prejudice, the defendant must show a reasonable probability that, but for

counsel's errors, the result of the proceeding would have been different."

*State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶

95 (citations omitted). "Failure to establish either element is fatal to the

claim." *State v. Jones,* 4th Dist. No. 06CA3116, 2008-Ohio-968, 2008 WL

613116, ¶ 14. Therefore, if one element is dispositive, a court need not

analyze both. *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52

(2000) (stating that a defendant's failure to satisfy one of the elements

"negates a court's need to consider the other").

**{¶41}** When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "A properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor,* 4th Dist. No. 07CA11, 2008-Ohio-482, 2008 WL 343328, ¶ 10, citing *State v. Smith,* 17 Ohio St.3d 98, 100 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's error were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Gondor,* 112 Ohio St. 3d 377, 2006-Ohio-6679, 860 N.E. 2d 77, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156, 524 N.E.2d 476 (1988).

**{¶42}** To establish prejudice, a defendant must demonstrate that a reasonable probability exists that but for counsel's error, the result of the trial would have been different. *State v. White,* 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), at paragraph three of the syllabus. Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be

affirmatively demonstrated. See *State v. Clark,* 4th Dist. No. 02CA684, 2003-Ohio-1707, 2003 WL 1756101, ¶ 22; *State v. Tucker,* 4th Dist. No. 01CA2592, 2002 WL 507529 (Apr. 2, 2002); *State v. Kuntz,* 4th Dist. No. 1691, 1992 WL 42774 (Feb. 26, 1992).

{¶43} A defendant must establish that counsel's failure to file a motion to suppress would have a reasonable probability of success and caused him prejudice. *Morrison,* ¶10; *State v. Robinson,* 108 Ohio App.3d 428, 670 N.E.2d 1077 (3rd Dist.1996).

{¶44} Additionally, in *Madrigal,* 87 Ohio St. 3d 378, 721 N.E.2d 52, the Ohio Supreme Court discussed the issue of the requirement of actual prejudice springing from the failure to file a motion to suppress evidence:

{¶45} "Madrigal assumes that the inquiry for the court is whether the motion to suppress would have been granted had it been filed, as if a probable granting of the motion to suppress meets the prejudice prong. However, assuming arguendo that counsel should have filed the motion, Madrigal cannot meet the prejudice prong of *Strickland,* that is, there exists "a reasonable probability that absent [Madrigal's attorneys'] errors, the factfinder would have had a reasonable doubt respecting guilty." *Strickland* at 695, 104 S. Ct. at 2068. Even assuming that Madrigal's suppression

motion would have been granted, and the gun would have been excluded, compelling evidence against him still existed." *Morrison,* ¶ 10,11, and 12.

## B.  LEGAL ANALYSIS

(1)  Counsel's failure to file a motion to suppress the recorded
statement of Appellant to Chief Deputy Warden.

{¶46}  In this matter, Appellant's counsel did not file a motion to suppress Appellant's statement to Chief Deputy Warden.  On appeal, counsel argues it is clear from the evidence that Appellant was significantly impaired at the time he gave his statement. As such, it is argued Appellant could not effect a knowing and voluntary waiver of his Miranda rights. According to Lorena Smith, Appellant was still recovering from his injuries in a motorcycle accident and unable to walk well.   On the day before the murder, Appellant had consumed 36 beers and had been acting unruly.  She insisted he leave her house and she drove him to his trailer, leaving him with 72 more beers to drink.

{¶47}  Timothy Jenkins, who saw Appellant between 12:30 and 1:00 a.m. on June 19t, also testified Appellant had been drinking.

{¶48}  Shane Lucas testified that Appellant showed up at his home between 4:30 and 5:00 a.m. on June 19th, and together they bought and drank 3 six-packs of Busch Light beer.  When Appellant went boating with the Lucas family, he passed out. Counsel also points out Appellant was tased

at the Stroud's Run campground prior to giving his statement and was found incompetent to stand trial approximately two months after these events.

{¶49} "[I]t is well-settled that the taking of an involuntary confession violates the Due Process Clause of the Fourteenth Amendment. See, e.g., *Spano v. New York,* 360 U.S. 315 * * *(1959). A coerced confession may also be found to violate the Fifth Amendment privilege against self-incrimination." *State v. Klapka,* 2004-Ohio-2921, 2004 WL 1238411, ¶17, citing *State v. Comstock,* 11th Dist. No. 96-A-0058, 1997 Ohio App. LEXIS 3670 (Apr. 15, 1997), at *7. "The question of voluntariness is a question of law, and as such, an appellate court must independently review the facts to arrive at its own conclusion as to whether a given confession was voluntary." *Id.* at *6-*7 (citations omitted). The state bears the burden of establishing the voluntariness of a confession by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 1577, 168-169, 107 S. Ct. 515 (1986).

{¶30} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or

inducement." *State v. Edwards,* 49 Ohio St. 2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. *State v. Michael,* 4th Dist. No. 09CA887, 2010-Ohio-5296, 2010 WL 4273225, ¶ 9.  A statement is voluntary "absent evidence that [the suspect's] will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Dailey*, 53 Ohio St.3d 88, 559 N.E.2d 459 (1990), paragraph two of the syllabus.

{¶31}  In the case at bar, we do not believe a motion to suppress would have had a reasonable probability of success.  In considering the totality of the circumstances, the trial court would likely have found Appellant's statement to Chief Deputy Mark Warden to be knowing and voluntary. It is also likely the trial court would have found no evidence that Appellant's will was overborn by coercive police conduct.

{¶32}  At the time Appellant gave his statement to Warden, he was 49 years old. The evidence does demonstrate Appellant was in handcuffs and complained about the handcuffs and being tased.   He had an adult criminal history which included three convictions for domestic violence and one conviction for aggravated menacing.  There is no evidence in the record or on the recorded statement that Appellant was threatened or made promises in exchange for his statement. In fact, Appellant specifically

showed verbalized willingness to talk to Chief Deputy Mark Warden. We disagree that Appellant's being tased, his subsequent mental incompetency, and his heavy use of intoxicants rendered his recorded statement involuntarily given.

{¶33}  Although Appellant had been drinking heavily for at least 2 days and indicated he had consumed cocaine, some of the effects of these intoxicants ostensibly may have worn off by the time his statement was given.  Appellant's statement began at 4:15 p.m. and continued for approximately 51 minutes.   There is no evidence that he drank anything after the beer he consumed with Shane Lucas around 5:30 a.m. that morning. According to Shane Lucas's testimony, Appellant passed out on his boat. When he was apprehended at the campground, he was sleeping on a park bench.  At the time Appellant gave his statement, 4:15 p.m., Appellant may have been "hung over" and just awakened, but he may not necessarily have been under the full influence of the intoxicants. In addition, due to his history of heavy alcohol and drug use over the years, especially at Thanksgiving and Christmas, Appellant may have been able to tolerate large amounts of intoxicants more functionally than the average person.

{¶34}  More importantly, Appellant's statement to Mark Warden, although rambling, was consistently self-serving and calculated.

Throughout the statement, Appellant repeatedly denied knowing where he had been the previous night, knowing what he was being asked about, knowing what happened at the Rogers' home, and knowing what happened to Homer Rogers.  Appellant stated "I know I didn't kill him."

{¶35}  Although Appellant had been drinking heavily in the previous days, he had the presence of mind to present alternative theories as to what happened to Rogers.  Appellant informed that Lynn and her father had been calling him, taunting him, and threatening to kill him.   Appellant informed that Rogers had raped his daughter Lynn, in an effort to portray the decedent as a bad man.  Appellant informed that Lynn had "begged" him to kill her father and informed that Lynn stood to inherit a lot of money upon her father's death, in an effort to cast suspicion upon Lynn.   Appellant also responded confidently that Shane Lucas "did not see him" drive the red pickup truck onto the trash pile.

{¶36}  We also disagree with Appellant's argument that his alleged lack of competency influenced his giving the recorded statement to Chief Deputy Warden.  In September 2010, the court found Appellant incompetent to stand trial and mentally ill.  Appellant was admitted to Moritz Forensic Center of Twin Valley Behavioral Healthcare on October 14, 2010, for a course of treatment and competency restoration.   In March, 2011, Dr.

Dennish Eshbaugh, PhD., prepared a status report regarding Appellant's

competency restoration.    This report casts doubt on Appellant's previous

claim of incompetency due to mental illness. Dr. Eshbaugh's report

observes:

>    Over the course of admission the medical records report
> that he has not presented signs or symptoms of serious mental
> illness.  His thinking has continued to be clear and he has not
> expressed delusional material…His psychiatrist has noted that
> the defendant tends to present a depressive demeanor in his
> presence, but when the defendant is socializing with other
> patients and the staff his affect becomes bright and
> robust….After reviewing the documentation of the defendant's
> participation in treatment groups and competency restoration
> programming, there is evidence that the defendant has been
> malingering memory deficits.  His performance in treatment
> groups has been noted as effective.  He actively participates in
> groups that focus on topics such as depression, coping skills,
> substance abuse, etc., and in those groups he does not show any
> significant difficulty understanding and learning new material.
> … While his memory functions have been reported to be intact
> in most activities, in competency restoration programming his
> performance has been poor.  He has reportedly acted as if he
> has difficulty understanding and learning the material
> presented.  He has continued to report that he has no recall any
> events associated with the instant charges.  Because of the
> inconsistency of memory between groups his psychiatrist has
> continued the diagnosis of malingering memory deficits.

{¶37} Based on our review of the record, we do not believe a motion

to suppress would have been successful.  As such, we cannot find Appellant

was prejudiced by counsel's failure to file the motion.

{¶38}  Similar to the analysis in *Madrigal*, had a motion to suppress been filed and granted, there was still overwhelming evidence of Appellant's guilt.   Appellant had been making disturbing phone calls to the decedent's house on June 18th, so intimidating that the testimony was Homer Rogers was considering calling law enforcement.  Appellant's daughter, Lorena Smith, admitted Appellant had been making threats against Lynn and Homer in the days just before the murder.

{¶39}  There was also testimony that Appellant was familiar with the woods and area between his trailer and the Rogers' home, and he was familiar with the Rogers' home.  Although Lorena Smith testified she did not think her father could have walked the 2-3 mile walk between the homes, she admitted he was walking with a limp and had walked with her to a store recently.   Tim Jenkins testified he had seen Appellant at a party during the early hours of June 19th, and although he had been drinking and was limping, he was able to walk. Mr. Jenkins also considered Appellant able to drive.

{¶40}  Kimberly Schaefer, Rogers' daughter, testified her father's truck was in his yard when he left her home late on June 18th.  The next morning, the truck was gone.  The decedent's red pickup truck was eventually discovered in a wooded area, partially obscured, at Shane Lucas's

house in Athens County, where Appellant had gone on June 19th. The car trailer attached to the truck was discovered at Appellant's trailer on June 19th. When Appellant presented to Shane Lucas's door at 4:30 or 5:00 a.m. in the morning, wanting to go buy beer, he indicated he had been dropped off by a friend. Shane Lucas was unaware the vehicle was parked on his property until the investigation unfolded.

{¶41} Moreover, when the red pickup truck was discovered, a knife with the reddish-brown substance, later determined to be blood, was discovered in the center console. Raymond Peoples testified that when he analyzed the DNA samples taken from the knife, both Appellant's and decedent's DNA profile mixtures were found on the blade of the knife. Only Appellant's DNA was found on the handle of the knife. Lynn Rogers later testified that this knife was one of three Appellant and she bought a few months before. The other two knives were located in a can in Appellant's trailer.

{¶42} More damaging than Appellant's recorded statement to Chief Deputy Warden was his confession to Shane Lucas. Mr. Lucas testified Appellant, while crying, admitted stabbing the decedent in the neck, laying the decedent on the couch, and covering decedent's body with a blanket.

{¶43}  Assuming a motion to suppress the recorded statement to Mark Warden had been filed and granted, the transcript is replete with additional compelling evidence, direct and circumstantial, of Appellant's guilt.  We do not find Appellant was prejudiced by counsel's failure to file a motion to suppress.

(2) Counsel's failure to object to the playing of Appellant's statement to Chief Deputy Warden at trial.

{¶44}  At trial, Appellant's counsel did not object to the introduction of his recorded statement to Chief Deputy Warden. As such, this alleged error is governed by the plain error standard.  Under Crim.R.52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *State v. Haynes,* 130 Ohio App.3d 31, 719 N.E.2d 576, (4th Dist. 1998), Fn 3.  The judgment of the trial court will be reversed under the plain error rule only if (1) error has occurred and, (2) but for that error, the result of the trial would clearly have been otherwise.  *Id.*  at Fn 3. See *State v. Underwood,* 3 Ohio St.3d 12, 444 N.E.2d 1332.  The rule should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice. *Haynes,* at Fn 3.

{¶45}  Furthermore, the decision not to object to the playing of Appellant's recorded statement to Chief Deputy Warden may have amounted to a tactical decision. Generally, counsel's strategic decisions and

trial tactics will not support a claim of ineffective assistance. *State v. Morrison,* 4th Dist. No. 03CA13, 2004 Ohio -5724, 2004 WL 2421875, ¶ 8.

{¶46}  In this matter, the defense's trial strategy, apparently, was to attempt to create reasonable doubt as to Appellant's guilt by casting suspicion upon his estranged ex-wife, Lynn Rogers. The defense's theory of Appellant's case was that Lynn Rogers hated her ex-husband, may have hated her father, and/or desired to inherit $600,000.00.  Trial counsel argued in closing that Lynn Rogers or Wayne McClain were never investigated, and from the beginning, and Lynn steered the investigation in the direction of her husband.   The defense needed to show why Lynn may have hated her father enough to plan his death. Appellant's allegation that the decedent raped Lynn Rogers is contained in the recorded statement.  The defense also needed the jury to know Lynn had a financial incentive to do so. Appellant also accomplishes this objective via the recorded statement.

{¶47}  Again, as previously discussed above, there was overwhelming evidence of Appellant's guilt.  In our view, had the recorded statement to Chief Deputy Warden been excluded, there was still compelling evidence to find Appellant guilty beyond a reasonable doubt on each element of the crimes charged. We find no error, let alone plain error, in this regard. We further find no prejudice to the defendant by counsel's decision not to object.

(3)  Counsel's failure to object to the statements of Cynthia Lynn
Rogers regarding alleged prior bad acts of Appellant.

{¶48}  We also believe that the decision not to object to the admission of Lynn Roger's statements clearly amounts to a tactical decision on trial counsel's part.  To further advance the theory that Lynn Rogers orchestrated or facilitated her father's murder and "set up" Appellant, the jury needed to believe Lynn Rogers despised Appellant.   To do so, the jury needed to be aware of Lynn's history of physical abuse by Appellant. Again, no objection was lodged as to Lynn Rogers' testimony about Appellant's years of physically abusing her.

{¶49}  In our view, trial counsel was exercising professionally reasonable trial strategy.  There exists a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Robinson,* at ¶ 2, citing *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Furthermore, "strategy and tactical decisions exercised by defense counsel 'well within the range of professionally reasonable judgment' need not be analyzed by a reviewing court." *Robinson* ¶2, citing *State v. Walker,* 90 Ohio App.3d 352, 259, 629 N.E.2d 471, 475 (1993), quoting *Strickland,* 466 U.S. at 699, 104 S. Ct. at 2070.  In this matter, we are not convinced that counsel's failure to object to the statements of Lynn Rogers regarding

alleged physical abuse over the years prejudiced Appellant so as to deprive him of a fair trial.

{¶50} Based upon the foregoing, we cannot find Appellant was prejudiced by his counsel's (1) failure to file a motion to suppress the recorded statement given to Chief Deputy Warden, (2) failure to object to the playing of that statement at trial, or (3) failure to object to the admission of Cynthia Lynn Rogers' statements regarding alleged prior physical abuse by Appellant. Therefore, we cannot find Appellant received constitutionally ineffective assistance of counsel under the *Strickland* analysis. As such, we overrule Appellant's first assignment of error.

## ASSIGNMENT OF ERROR TWO

{¶51} Appellant also contends the trial court erred by failing to grant Defendant-Appellant's Rule 29 motion to dismiss the charge of tampering with evidence. After presentation of the State's case, defense counsel moved to dismiss the tampering with evidence charge. The State argued that Appellant took Homer Rogers' truck, containing the murder weapon to another county and drove it into a weeded area so as to hide it from view. Appellant argued the truck was in plain view from the road nearby. The trial court denied the Crim.R. 29 motion and let the charge go

to the jury. On appeal, Appellant argues there was no evidence to justify the charge being given to the jury for consideration. We disagree.

## A. STANDARD OF REVIEW

{¶52} The standard of review for a Crim.R. 29(A) motion is Generally the same as a challenge to the sufficiency of the evidence. *State v. Hollis,* 4th Dist. No. 09CA9, 2010-Ohio-3945, 2010 WL 3294327, ¶19. See *State v. Hairston,* 4th Dist. No. 06CA3081, 2007 Ohio-3880, 2007 WL 2181535, at ¶ 16; *State v. Brooker,* 170 Ohio App.3d 570, 2007-Ohio-588, 868 N.E.2d 683, at ¶8. Appellate courts must determine whether the evidence adduced at trial, if believed, supports a finding of guilt beyond a reasonable doubt. See *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541; *State v. Jenkins,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶53} In other words, when reviewing a case to determine if the record contains sufficient evidence to support a criminal conviction, we must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a

reasonable doubt." *Hollis,* ¶20, citing *State v. Smith,* 4th Dist. No. 06CA7, 2007-Ohio-502, 2007 WL 357274, at ¶ 33, quoting *State v. Jenkins* at paragraph two of the syllabus.  See, also, *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781 (1979).

{¶54}  The sufficiency of the evidence test "raises a question of law and does not allow us to weigh the evidence," *Hollis* at ¶21; *Smith* at ¶34, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).  Instead, the sufficiency of the evidence test "'gives full play to the responsibility of the trier of fact [to fairly] resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Smith* at ¶34, citing *State v. Thomas,* 70 Ohio St. 2d 79, 79-80, 434 N.E.2d 1356 (1982); *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E. 2d 212 (1967), paragraph one of the syllabus.

## B.  LEGAL ANALYSIS

{¶55}  Appellant was convicted of tampering with evidence, in violation of R.C. 2921.12(A)(1), which reads:

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceedings or investigation….

At the end of the State's case, the trial court had heard evidence that:

1) Homer Roger's death was caused by a knife wound;

2) a knife with a reddish-brown substances was found inside Rogers' pickup truck that had been removed from his yard in Washington County and removed to a wooded area in Athens County;

3) the knife was tested by specialists at Ohio BCI who determined that the DNA profile on the handle of the knife matched Gerald Smith's profile, and the DNA profile on the blade of the knife was a mixture of Homer Rogers' and Gerald Smith's DNA profiles;
4) Appellant had arrived at the Lucas residence in the early morning hours of June 19, 2010, on foot; and,

5)  the decedent's pickup truck was discovered parked on the Lucas property later on June 19th.

{¶56}  We believe that the trial transcript contains evidence from which any rational trier of fact could have found the essential elements of the tampering with evidence charge proven beyond a reasonable doubt.

{¶57}  As to the element of "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted,"  the trial court heard evidence that Appellant confessed  to Shane Lucas of shooting or stabbing the decedent, placing his body on the couch, and covering it up.  From this evidence, the logical inference is that Appellant would be aware that because of the seriousness of his actions, an official proceeding or investigation would be likely to be instituted.

**{¶58}** As to the elements of "conceal or remove, any… thing…with purpose to impair is…availability as evidence," the trial court had the testimony of the various State's witnesses who demonstrated that the murder weapon- the bloody knife with the DNA of both victim and suspect- was found in the decedent's red pickup truck. The decedent's pickup truck had been in his yard in Washington County, the night before, according to his daughter. Various State's witnesses testified the pickup truck was discovered in a wooded area in Athens County, partially obscured by tall weeds and woods. Mark Johnson testified the Lucas residence was nearly 100 yards from Salem Road. The red pickup truck was found parked 30-40 yards beyond the residence. Appellant had appeared at the Lucas residence in the early morning hours of June 19th, on foot, claiming he had been dropped off. Shane Lucas testified Appellant had driven the truck before but parked it in the area of the house, not up into the woods. From these facts, it may be inferred Appellant was attempting to conceal or remove the bloody knife in the pickup truck in a desperate effort to thwart or stymie any investigation, or to diminish the value of the knife and truck as evidence.

**{¶59}** We find that there was sufficient evidence on each element of the tampering charge to allow it to go to the jury. As such, we find the trial court did not err by denying Appellant's Crim.R. 29 motion to dismiss the

tampering charge.  We affirm the judgment of the trial court and overrule

Appellant's second assignment of error.

**JUDGMENT AFFIRMED.**

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs herein be taxed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.

Harsha, J. & Abele, J.: Concur in Judgment and Opinion.


                                        For the Court,

                                        BY: _____
                                             Matthew W. McFarland
                                             Presiding Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**